# EXHIBIT B

FILED

2017 DEC 21 AM 9: 41

BOARD OF PROFESSIONAL
RESPONSIBILITY

_____ EXEC SEC'Y

# IN DISCIPLINARY DISTRICT V
## OF THE
# BOARD OF PROFESSIONAL RESPONSIBILITY
## OF THE
# SUPREME COURT OF TENNESSEE

IN RE:    **BRIAN PHILIP MANOOKIAN,**    **DOCKET NO.** 2017-2809-5-WM
**BPR# 26455, Respondent,**
**An Attorney Licensed to**
**Practice Law in Tennessee**
**(Davidson County)**

---

## PETITION FOR DISCIPLINE

---

Comes now the Petitioner, the Board of Professional Responsibility of the Supreme Court of Tennessee, by and through Disciplinary Counsel, pursuant to Rule 9 of the Rules of the Supreme Court, and files this Petition for Discipline against Brian Philip Manookian.

1.    The Respondent, Brian Philip Manookian, is an attorney admitted by the Supreme Court of Tennessee to practice law in the State of Tennessee in 2007. The Respondent's most recent primary/office address as registered with the Board of Professional Responsibility is 45 Music Square West, Nashville, Tennessee 37203-3205. The Respondent's Board of Professional Responsibility number is 26455.

2.    Pursuant to Tenn. Sup. Ct. R. 9, § 8.1, any attorney admitted to practice law in Tennessee is subject to the disciplinary jurisdiction of the Supreme Court, the Board of Professional Responsibility, the Hearing Committee, hereinafter established, and the Circuit and Chancery Courts.

3.    Pursuant to Tenn. Sup. Ct. R. 9, § 1, the license to practice law in this state is a privilege and it is the duty of every recipient of that privilege to conduct himself at all times in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law. Acts or omissions by an attorney which violate the Rules of Professional Conduct

of the State of Tennessee shall constitute misconduct and be grounds for discipline.

4.     Mr. Manookian has failed to conduct himself in conformity with said standards and is guilty of acts and omissions in violations of the authority cited.  The Board of Professional Responsibility authorized the filing of formal charges on December 8, 2017.

### File No. 44907-5-BG – Complaint of David Blank

5.     On November 2, 2015, the Board of Professional Responsibility received a complaint of misconduct from Charles Kaplan, Esq., on behalf of David Blank alleging ethical misconduct by Mr. Manookian.

6.     On November 4, 2015, the Board sent a copy of the complaint to Mr. Manookian.

7.     Mr. Manookian provided a response to the complaint on November 16, 2015.

8.     At all times material hereto, Cummings Manookian, PLC ("Cummings Manookian") was and is a Tennessee limited liability company effective January 1, 2015.

9.     At all times material hereto, Mr. Manookian and Brian Cummings were and are the members of Cummings Manookian.

10.     Diamond Consortium, Inc., d/b/a Diamond Doctor ("the Diamond Doctor"), was a diamond retailer in Dallas, Texas. David Blank was the owner and/or principal of the Diamond Doctor.

11.     In 2015, Cummings Manookian began an internet advertising campaign alleging diamond over-grading by the Diamond Doctor through the websites, "www.diamonddoctorlawsuit.com" and "www.diamonddoctorclassaction.com".

12.     Cummings Manookian caused messages to be placed on the Diamond Doctor's Facebook newsfeed that placed the Diamond Doctor's business practices in a negative light.

13.     Cummings Manookian caused fliers and door hangers to be distributed near the Diamond Doctor store and in Mr. Blank's residential neighborhood that placed the Diamond Doctor's business practices in a negative light.

14.     Through websites, Cummings Manookian solicited clients to bring claims against the Diamond Doctor.

15.     Through Facebook posts, Cummings Manookian solicited clients to bring claims against the Diamond Doctor.

16.     Through fliers and door hangers, Cummings Manookian solicited clients to bring claims against the Diamond Doctor.

17.     On February 3, 2016, the Diamond Doctor and Mr. Blank sued Mr. Manookian in the United States District Court for the Eastern District of Texas ("the lawsuit") as a result of Cummings Manookian's internet advertising campaign, the Facebook posts and the fliers and door hangers. Eventually, Mr. Cummings, Cummings Manookian and Mark Hammervold were added as defendants.

18.     Cummings Manookian engaged in other internet advertising campaigns regarding other diamond retailers alleging diamond over-grading.

19.     Mr. Blank learned about other jewelers having experienced Cummings Manookian's internet advertising campaigns.

20.     One or more other jewelers that had been the subject of Cummings Manookian's internet advertising campaigns agreed to pay Cummings Manookian a monthly sum for a term of years resulting in the termination of the internet advertising campaigns.

21.     Mr. Blank was told that one or more jewelers had ended Cummings Manookian's internet advertising campaigns by agreeing to pay Cummings Manookian a monthly sum for a

term of years.

22.    After filing suit against Mr. Manookian, Mr. Blank initiated telephone conversations with Mr. Manookian for the purpose of negotiating an agreement for the Diamond Doctor to retain Cummings Manookian as its attorneys in exchange for which Cummings Manookian would cease its advertising campaign and would refrain from filing any suits against the Diamond Doctor.

23.    During these telephone conversations, Mr. Manookian advised Mr. Blank that he already represented several clients regarding diamond over-grading by the Diamond Doctor.

24.    Mr. Manookian sent Mr. Blank a draft of a Consulting/Engagement Agreement. A true and exact copy of the agreement is attached hereto as Exhibit A.

25.    Mr. Manookian proposed to Mr. Blank that they execute an agreement calling for the Diamond Doctor to pay Cummings Manookian $25,000 per month for a term of ten years.

26.    While Mr. Manookian and Mr. Blank were negotiating a possible agreement, Cummings Manookian ceased its advertising campaign.

27.    The negotiations between Mr. Manookian and Mr. Blank did not result in an agreement.

28.    After negotiations ended, Cummings Manookian resumed its advertising campaign.

29.    The Cummings Manookian internet advertising campaign was undertaken at least in part for the purpose of coercing the Diamond Doctor to enter into a Consulting/Engagement Agreement (Exhibit A) whereby the Diamond Doctor would pay Cummings Manookian a substantial sum of money.

30.    As a result of the negotiations between Mr. Manookian and Mr. Blank, Mr. Blank and the Diamond Doctor were "prospective clients" of Mr. Manookian, Mr. Cummings and

Cummings Manookian as defined in RPC 1.18 (Prospective Clients).

31. At the same time as Mr. Blank and the Diamond Doctor were prospective clients of Mr. Manookian, Mr. Cummings and Cummings Manookian, Cummings Manookian represented customers of the Diamond Doctor regarding alleged over-grading of diamonds sold them by the Diamond Doctor.

32. The Diamond Doctor sold its assets to another diamond retailer, Diamonds Direct.

33. Cummings Manookian began representing Diamonds Direct.

34. Mr. Manookian did not file any lawsuits against the Diamond Doctor on behalf of clients alleging diamond over-grading.

35. Mark Hammervold is a Tennessee attorney who formerly practiced with Mr. Manookian and Mr. Cummings.

36. Customers of the Diamond Doctor who contacted Cummings Manookian as a result of its advertising campaign were referred by Cummings Manookian to Mr. Hammervold.

37. Cummings Manookian came into possession of certain confidential information possessed first by the Diamond Doctor, and later by Diamonds Direct, which information included the names of persons that had purchased diamonds from the Diamond Doctor and the purchase prices of those diamonds.

38. Despite the fact that Mr. Blank and the Diamond Doctor were its prospective clients, and Diamonds Direct was its actual client, Cummings Manookian caused this confidential customer information to be posted in its internet advertisement campaign.

39. On May 4, 2017, Mr. Manookian incorporated Diamond Integrity Standards Foundation ("DISF") in Tennessee as a nonprofit corporation. A true and exact copy of the Tennessee Department of State "Filing Information" for DISF as of December 13, 2017 is attached

5

hereto as <u>Exhibit B</u>.

40.    Cummings Manookian was the registered agent for DISF.

41.    DISF had the same address as Cummings Manookian.

42.    At the time DISF was incorporated, the trial in the lawsuit was set to begin on August 15, 2017.

43.    DISF was the alter ego of Cummings Manookian.

44.    On May 4, 2017, the domain name "ddvictimfund.com" was registered.

45.    The domain name "ddvictimfund.com" was registered anonymously via DomainsByProxy.com.

46.    A true and exact copy of the "Whois Results" domain registration information for "ddvictimfund.com" is attached hereto as <u>Exhibit C</u>.

47.    Cummings Manookian caused the "ddvictimfund.com" website to be created.

48.    The "ddvictimfund.com" website contained a link to the Cummings Manookian website.

49.    The "ddvictimfund.com" website was a Cummings Manookian advertisement seeking potential clients to sue the Diamond Doctor for diamond over-grading.

50.    The "ddvictimfund.com" website does not contain the name of a lawyer or law firm assuming responsibility for the communication.

51.    The "ddvictimfund.com" website included a list of Diamond Doctor customer names, dates of purchase, purchase prices, and detailed information about their diamonds.

52.    On June 10, 2017, the domain name "ddtaxfraud.com" was registered.

53.    The domain name "ddtaxfraud.com" was registered anonymously via DomainsByProxy.com.

54. A true and exact copy of the "Whois Results" domain registration information for "ddtaxfraud.com" is attached hereto as Exhibit D.

55. Cummings Manookian caused the "ddtaxfraud.com" website to be created.

56. The "ddtaxfraud.com" website was a Cummings Manookian advertisement seeking potential clients to sue the Diamond Doctor for diamond over-grading.

57. The "ddtaxfraud.com" website does not contain the name of a lawyer or law firm assuming responsibility for the communication.

58. The "ddtaxfraud.com" website included a list of Diamond Doctor customer names, dates of purchase, purchase prices, and detailed information about their diamonds.

59. On or about May 22, 2017, Cummings Manookian caused to take place a "ring-less voicemail" campaign with recorded messages to approximately 175 Diamond Doctor customers accusing the Diamond Doctor of fraud and directing recipients to the "ddvictimfund.com" website.

60. The "ring-less voicemail" campaign was a solicitation by Cummings Manookian to specifically identified recipients, a significant motive for which was pecuniary gain, and did not contain the information required by RPC 7.3 (Solicitation of Potential Clients).

61. Anonymous emails were sent to Ronnie Mervis and Rob Bates, potential witnesses at the trial of the lawsuit, informing them of the "ddvictimfund.com" website.

62. Cummings Manookian caused the anonymous emails to be sent.

63. The plaintiffs in the lawsuit filed an Emergency Motion to Show Cause.

64. Mr. Manookian, Mr. Cummings and Cummings Manookian filed responses to the motion.

65. A show cause hearing was held on July 12, 2017 during which Mr. Manookian was represented by counsel and testified.

66.     As a result of the show cause hearing, an order was entered by the magistrate judge ordering Mr. Manookian to submit to the plaintiffs: 1) the name of a DISF corporate representative whom the plaintiffs could depose by July 17, 2017; 2) the names of the 175 persons who received the "ring-less voicemails"; and all documents related to his association with DISF.

67.     Mr. Manookian, Mr. Cummings and Cummings Manookian filed responses to the order.

68.     Through counsel, on July 21, 2017, Mr. Manookian informed the plaintiffs' attorney that he no longer represented DISF, the corporate representative of DISF was Felipe DeMase, and he did not have a list of the 175 persons receiving the "ring-less voicemails". A document submitted pursuant to the order was an attorney-client agreement between Cummings Manookian and Mr. DeMase purportedly signed by Mr. DeMase on June 7, 2017.

69.     The magistrate judge entered its Opinion and Order Regarding Sanctions on August 3, 2017. A true and exact copy of the Opinion and Order Regarding Sanctions is attached hereto as Exhibit E.

70.     In its Opinion and Order Regarding Sanctions, the magistrate judge made the following findings:

      a.  Mr. Manookian and/or Cummings Manookian are one and the same as DISF. (Exhibit E, page 18)

      b.  Mr. Manookian orchestrated the circumstances allowing for the creation of DISF and the publication of the "ddvictimfund.com" and "ddtaxfraud.com" websites containing Diamond Doctor customer information. (Exhibit E, page 18)

      c.  Mr. DeMase was either a "straw man" or did not exist. (Exhibit E, page 18)

8

d. The publication of the aforementioned websites by Mr. Manookian, Mr. Cummings and Cummings Manookian was a deliberate attempt to disrupt the integrity of the trial of the lawsuit by jury by improperly influencing witnesses and/or prejudicing the jury pool. (Exhibit E, page 19)

e. The timing and publication of the websites constitute bad faith conduct by Mr. Manookian in abuse of the judicial process. (Exhibit E, pages 19-20)

f. Mr. Manookian's actions in response to earlier orders were in bad faith. (Exhibit E, page 20)

g. Though Mr. Manookian claims that Mr. DeMase was responsible for the creation of DISF, its incorporation application was submitted on May 4, 2017 but the client agreement was allegedly signed on June 7, 2017, the day before the application was granted. Therefore, the documents submitted by Mr. Manookian do not accurately reflect the sequence of events relating to Mr. Manookian's representation of DISF. (Exhibit E, pages 20-21)

h. The client agreement was created by Mr. Manookian after the fact in specific response to the court's order which conduct constitutes fraud and an abuse of the judicial process. (Exhibit E, page 21)

i. DISF's status as a registered entity was terminated on July 21, 2017, the date Mr. Manookian was to comply with the court's orders. The fact that Mr. Manookian claimed he no longer represented DISF, and could not compel testimony by Mr. DeMase, constitutes bad faith on the part of Mr. Manookian. (Exhibit E, page 21)

9

j.  The actions by Mr. Manookian, Mr. Cummings and Cummings Manookian were deliberately calculated to conceal information from the court. (<u>Exhibit E</u>, page 22)

k.  DISF had no other reason to exist but to publicize negative information about the plaintiffs very close to trial. (<u>Exhibit E</u>, page 22)

l.  Throughout the lawsuit, Mr. Manookian feigned adherence to ethical rules, while seemingly using those same ethical rules as a pretense to thwart the court's efforts to make a thorough and informed inquiry. (<u>Exhibit E</u>, page 23)

m.  Mr. Manookian acted in bad faith and disrupted the litigation process. (<u>Exhibit E</u>, page 23)

n.  DISF is an alter ego controlled by Mr. Manookian, Mr. Cummings and Cummings Manookian. (<u>Exhibit E</u>, page 27)

o.  Mr. DeMase is a fictitious person. (<u>Exhibit E</u>, page 27)

71.  By its Order of August 15, 2017, the Opinion and Order Regarding Sanctions was adopted by the district judge. A true and exact copy of the August 15, 2017 Order is attached hereto as <u>Exhibit F</u>.

72.  On May 27, 2016, Mr. Manookian wrote a letter to an attorney representing him in the lawsuit proposing a settlement of various matters. That letter was sent by Mr. Manookian's attorney to an attorney for the plaintiffs. A true and exact copy of the May 27, 2016 letter is attached hereto as <u>Exhibit G</u>.

73.  In <u>Exhibit G</u>, Mr. Manookian offered to settle with the plaintiffs in a manner which restricted him from filing future lawsuits against the plaintiffs. (<u>Exhibit F</u>, page 3, ¶ 1.b.)

74.    In Exhibit G, Mr. Manookian offered to make an aggregate settlement for multiple clients with claims against the Diamond Doctor without meeting the requirements of RPC 1.8(g) (Conflict of Interest: Current Clients: Specific Rules).

75.    By publishing the customer information to websites as described herein, Mr. Manookian revealed confidential information pertaining to a prospective client, the Diamond Doctor, and an actual client, Diamonds Direct, in violation of RPC 1.6(a) (Confidentiality of Information).

76.    By negotiating with Mr. Blank for the representation of the Diamond Doctor, at the same time that Mr. Manookian was representing clients with claims against the Diamond Doctor for diamond over-grading, Mr. Manookian violated RPC 1.7(a) (Conflict of Interest: Current Clients).

77.    By offering to make an aggregate settlement for multiple clients with claims against the Diamond Doctor for diamond over-grading, Mr. Manookian violated RPC 1.8(g) (Conflict of Interest: Current Clients: Specific Rules).

78.    By offering to settle with the plaintiffs in a manner which restricted him from filing future lawsuits against the plaintiffs, Mr. Manookian violated RPC 5.6(b) (Restrictions on Right to Practice).

79.    By creating DISF, and by publishing the content of the DISF websites as if it was a distinct entity and not the alter ego of his firm, Mr. Manookian made misleading communications about his services in violation of RPC 7.1 (Communications Concerning a Lawyer's Services).

80.    By failing to include the name of an attorney or law firm assuming responsibility for the communications in the DISF websites, Mr. Manookian violated RPC 7.2(d) (Advertising).

81.    By causing the "ring-less voicemail" calls to be placed to approximately 175 Diamond Doctor customers, Mr. Manookian violated RPC 7.3(c) (Solicitation of Potential Clients).

82.    By attempting to coerce the Diamond Doctor to enter into a Consulting/Engagement Agreement, Mr. Manookian committed the crime of extortion, T.C.A. § 39-14-112, in violation of RPC 8.4(b) (Misconduct).

83.    By engaging in the various acts of dishonesty, deceit and bad faith set out in ¶ 70 above, Mr. Manookian violated RPC 8.4(c) and (d) (Misconduct).

## **ALLEGED VIOLATIONS**

84.    The acts and omissions by Mr. Manookian constitute ethical misconduct in violation of the relevant portions of Rules of Professional Conduct 1.6(a), 1.7(a), 1.8(g), 5.6(b), 7.1, 7.2(d), 7.3(c) and 8.4(a), (b), (c) and (d):

### **Rule 1.6(a)**
### **CONFIDENTIALITY OF INFORMATION**

(a)    A lawyer shall not reveal information relating to the representation of a client unless:

(1)    the client gives informed consent;

(2)    the disclosure is impliedly authorized in order to carry out the representation; or

(3)    the disclosure is permitted by paragraph (b) or required by paragraph (c).

### **Rule 1.7(a)**
### **CONFLICT OF INTEREST:  CURRENT CLIENTS**

(a)    Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1)    the representation of one client will be directly adverse to

another client; or

(2)     there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

## Rule 1.8(g)
## CONFLICT OF INTEREST: CURRENT CLIENTS: SPECIFIC RULES

(g)     A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement as to guilty or nolo contendere pleas, unless:

(1)     each client is given a reasonable opportunity to seek the advice of independent legal counsel in the transaction; and

(2)     each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement.

## Rule 5.6(b)
## RESTRICTIONS ON RIGHT TO PRACTICE

A lawyer shall not participate in offering or making:

(b)     an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.

## Rule 7.1
## COMMUNICATIONS CONCERNING A LAWYER'S SERVICES

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading.

## Rule 7.2(d)
## ADVERTISING

(d)     Except   for   communications   by   registered   intermediary organizations, any advertisement shall include the name and office address of at least one lawyer or law firm assuming responsibility for the communication.

## Rule 7.3(c)
## SOLICITATION OF POTENTIAL CLIENTS

(c)    If a significant motive for the solicitation is the lawyer's pecuniary gain, a lawyer shall not send a written, recorded, or electronic communication soliciting professional employment from a specifically identified recipient who is not a person specified in paragraphs (a)(1) or (a)(2) or (a)(3), unless the communication complies with the following requirements:

(1)    The words "Advertising Material" appear on the outside of the envelope, if any, in which a communication is sent and at the beginning and ending of any written, recorded or electronic communication.

(2)    A lawyer shall not state or imply that a communication otherwise permitted by these rules has been approved by the Tennessee Supreme Court or the Board of Professional Responsibility.

(3)    If a contract for representation is mailed with the communication, the top of each page of the contract shall be marked "SAMPLE" and the words "DO NOT SIGN" shall appear on the client signature line.

(4)    Written communications shall not be in the form of or include legal pleadings or other formal legal documents.

(5)    Communications delivered to potential clients shall be sent only by regular U.S. mail and not by registered, certified, or other forms of restricted delivery, or by express delivery or courier.

(6)    Any communication seeking employment by a specific potential client in a specific matter shall comply with the following additional requirements:

(i)    The communication shall disclose how the lawyer obtained the information prompting the communication;

(ii)    The subject matter of the proposed representation shall not be disclosed on the outside of the envelope (or self-mailing brochure) in which the communication is delivered; and

(iii)    The first sentence of the communication shall state, "IF YOU HAVE ALREADY HIRED OR RETAINED A LAWYER IN THIS MATTER, PLEASE DISREGARD THIS MESSAGE."

14

(7)     A copy of each written, audio, video, or electronically transmitted communication sent to a specific recipient under this Rule shall be retained by the lawyer for two years after its last dissemination along with a record of when, and to whom, it was sent.

### Rule 8.4(a), (b), (c), and (d)
### MISCONDUCT

It is professional misconduct for a lawyer to:

(a)     violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b)     commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c)     engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(d)   engage in conduct that is prejudicial to the administration of justice.

## AGGRAVATING FACTORS

85.     After misconduct has been established, ABA Standards for Imposing Lawyer Sanctions, Section 9.2, provides for aggravating circumstances that may justify an increase in the degree of discipline to be imposed against him.

86.     Mr. Manookian's prior disciplinary offenses are an aggravating circumstance justifying an increase in discipline to be imposed against him.

87.     Mr. Manookian's dishonest or selfish motive is an aggravating circumstance justifying an increase in discipline to be imposed against him.

88.     Mr. Manookian's pattern of misconduct is an aggravating circumstance justifying an increase in discipline to be imposed against him.

89.     Mr. Manookian's multiple offenses are an aggravating circumstance justifying an increase in discipline to be imposed against him.

15

90.     Mr. Manookian's refusal to acknowledge the wrongful nature of his conduct is an aggravating circumstance justifying an increase in discipline to be imposed against him.

91.     Mr. Manookian's substantial experience in the practice of law is an aggravating circumstance justifying an increase in discipline to be imposed against him.

92.     Mr. Manookian's illegal conduct is an aggravating circumstance justifying an increase in discipline to be imposed against him.

## PRAYER FOR RELIEF

93.     WHEREFORE, PETITIONER REQUESTS that a Hearing Panel be appointed to hear testimony and to receive evidence in this cause and to make such finding of fact and order such disciplinary action as it may deem appropriate.


Respectfully Submitted,


William C. Moody, BPR No. 6752
Disciplinary Counsel--Litigation
10 Cadillac Drive, Suite 220
Brentwood, Tennessee 37027
(615) 361-7500


## NOTICE TO PLEAD

**TO:**    Brian Philip Manookian
45 Music Square West
Nashville, Tennessee 37203-3205

You are hereby notified that you are required to file your Answer with **Rita Webb, Executive Secretary, Board of Professional Responsibility, 10 Cadillac Drive, Suite 220, Brentwood, Tennessee 37027**, and serve a copy of your Answer upon Disciplinary Counsel within thirty (30) days after service of this Petition. If you fail to file an Answer, the allegations contained in the Petition for Discipline shall be deemed admitted and a default judgment taken.

**Certificate of Service**

I certify that a copy of the foregoing has been sent to Respondent, Brian Philip Manookian, by First Class U.S. Mail and by Certified Mail, No. 7012 3460 0000 0392 4542, Return Receipt Requested, addressed to him at 45 Music Square West, Nashville, Tennessee 37203-3205, on this the _2lst_ day of December, 2017.

William C. Moody

## CONSULTING/ENGAGEMENT AGREEMENT

THIS CONSULTING/ENGAGEMENT AGREEMENT ("Agreement") is made and entered into as of ▮▮▮▮▮▮▮▮ (the "Effective Date") by and between Cummings Manookian, PLC (the "Firm") and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Client"). The parties hereto are sometimes collectively referred to herein as the "Parties" and are sometimes individually referred to herein as a "Party."

## BACKGROUND

WHEREAS, the Client and Firm desire to enter into this Agreement whereby the Firm shall perform certain professional services for the Client in exchange for a monthly fee.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained and of the mutual benefits herein provided and other good and valuable consideration, the receipt of which is hereby acknowledged, the Client and Firm, intending to be legally bound, hereby agree as follows:

1. <u>Services to be Performed by Firm.</u> During the term of this Agreement, the Firm shall perform for the Client such services as are agreed to in writing by and between the parties and which shall be described and attached as **Exhibit A**, which is incorporated into and part of this Agreement (the "Services"). Nothing herein shall be intended to or interpreted as prohibiting the Firm from providing like or similar services to other individuals and entities at any time during the term of this Agreement or otherwise.

2. <u>Compensation.</u> As compensation for Firm's performance of the Services, the Client shall pay Firm as set forth on <u>Exhibit B</u>, which is incorporated into and part of this Agreement.

3. <u>Term of Agreement.</u> This Agreement shall remain in effect for the period of ▮▮▮▮▮ following the Effective Date, unless terminated pursuant to Section 4.

4. <u>Termination.</u>

    (a) <u>By the Client.</u> The Services of the Firm may be terminated by the Client upon written notice. Notwithstanding the foregoing, if the Client terminates the Services of the Firm, then Client agrees that it shall continue to pay the Firm through the full term of the Agreement.

    (b) <u>By Firm.</u> This Firm may terminate its Services to Client upon written notice for cause. Cause under this Section 5(b) is defined as the Client (i) breaching any material term of this Agreement or failing substantially to perform its obligations hereunder, including its obligation to compensation Firm, after written notice by Firm and a reasonable opportunity to cure, but in no event more than thirty (30) days.

5. <u>General Provisions.</u>

    (a) <u>Governing Law/Fee Shifting.</u> This Agreement shall be construed and interpreted in accordance with the internal laws of the State of Tennessee without regard to any

1



Exhibit A

choice of law or conflict of law provisions. In the event that any Party sues to enforce any provision of this Agreement, the prevailing party(ies) shall be entitled to all fees and costs (including reasonable and necessary attorneys' fees and costs) incurred in the enforcement of any rights hereunder.

(b) <u>Severability</u>. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions will nevertheless continue in full force and effect and the Agreement shall be construed in all respects as though such invalid or unenforceable provision were omitted.

(c) <u>Amendment</u>. This Agreement may only be changed by written consent of both parties.

(d) <u>Successors</u>. The rights and obligations of the Client under this Agreement shall inure to the benefit of and be binding upon the successors of the Client and the heirs and legal representatives of Firm.

(e) <u>Headings</u>. Headings used in this Agreement are solely for the convenience of the parties and shall be given no effect in the construction or interpretation of this Agreement.

(f) <u>Waiver</u>. No waiver of any breach shall be valid or binding unless approved in writing by the non-breaching party. Forbearance or indulgence by the non-breaching party shall not constitute a waiver of the covenant or condition to be performed by the breaching party or of any remedy available to the non-breaching party. No waiver of any breach of this Agreement shall constitute or be deemed a waiver of any other or subsequent breach.

(g) <u>Changes in Law</u>. In the event there are changes to or clarifications of federal, state or local statutes, regulations, or rules which would materially affect the operation of the Client, the parties agree to negotiate in good faith in an attempt draft applicable provisions to accommodate the changes in law.

(h) <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which together shall constitute only one Agreement.

(i) <u>Notice</u>. Any notice required to be given pursuant to this Agreement shall be in writing and shall be deemed to have been given when delivered in person, by courier, or by certified mail or when sent by email. Such notice or communication shall be addressed as follows:

If to Firm, to:

        CUMMINGS MANOOKIAN PLC
        Attn: Brian Manookian
        102 Woodmont Boulevard, Suite 241
        Nashville, TN 37205
        bmanookian@cummingsmanookian.com

If to the Client, to:

2



(j)    <u>Mediation</u>

(1)    The parties, prior to pursuing any other remedy, agree to attempt to resolve any dispute, claim or controversy arising out of or relating to the Agreement by mediation in Nashville, Tennessee. The parties further agree that their respective good faith participation in mediation is a condition precedent to pursuing arbitration.

(2)    Either party may commence the mediation process by providing to the other party written notice, setting forth the subject of the dispute, claim or controversy and the relief requested. Within ten (10) days after the receipt of the foregoing notice, the other party shall deliver a written response to the initiating party's notice. Parties will made a good faith effort for the initial mediation session to be held within thirty (30) days after the initial notice, or whenever the parties may agree. The parties agree to share equally the costs and expenses of the mediation (which shall not include the expenses incurred by each party for its own legal representation in connection with the mediation).

(k)    <u>Arbitration</u>.    Any dispute arising out of or relating to this Agreement, including the breach, termination or validity thereof, which has not been resolved by mediation as provided herein, shall be settled by arbitration administered by the American Arbitration Association in Nashville, Tennessee in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(l)    <u>Complete Agreement</u>.    This Agreement constitutes the complete understanding of the parties and supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter hereof, and no other agreements, either oral or in writing, between the parties hereto with respect to the subject matter hereof, and no other statement or promise relating to the subject matter of this Agreement which is not contained herein, shall be valid or binding.

*[signature page follows]*

3

IN WITNESS WHEREOF, the parties sign and execute this Consulting Agreement intending to be legally bound on the date set forth above.

CUMMINGS MANOOKIAN, PLC

By: _____

Name: __Brian Manookian_____

Title: __Member_____



4

## EXHIBIT A

### Description of Services

In exchange for the Compensation set out in Exhibit B, the Firm shall provide the following Services:

1. The Firm shall represent the Client in the following types of matters:

   a. Claims made by Client's customers against the Client;
   b. Claims made by Client's competitors against Client;
   c. Claims made by Client's vendors against Client;
   d. Claims made by Client against Client's customers;
   e. Claims made by Client against Client's competitors;
   f. Claims made by Client against Client's vendors.

2. "Claim" means any request or demand for relief concerning the purchase, sale, advertising, or marketing of Client's merchandise: (a) in a written communication such as, for example, a letter or email; and/or (b) in an original or amended complaint, petition, counterclaim, cross-claim, or other paper that is filed with (or otherwise submitted to) any court, arbitration panel, administrative agency, or other tribunal of competent jurisdiction in the United States of America.

3. Firm will advise Client on compliance and regulatory issues concerning the marketing and sale of Client's merchandise to Client's customers. Firm will provide advice and information to Client concerning "best practices" in the sale of Client's merchandise. Such advice and information includes, but is not limited to: form invoices, appraisals, certificates, customer education literature, and review of current website language and advertising materials.

4. With respect to the above Claims, the Client shall be responsible for and shall reimburse firm monthly for all expenses incurred as set out in Exhibit B.

5. With regard to the above Claims, the Firm shall serve as Client's attorney-of-record in any such proceeding. If the Firm, according to its judgment, determines that Local Counsel is reasonably necessary for its representation of Client or providing any Services pursuant to this Agreement in a particular jurisdiction or venue, the Client shall retain and compensate such Local Counsel as set out in Exhibit B.

1

## EXHIBIT B

### Compensation

In exchange for the Services set out in Exhibit A, the Client shall pay the Firm as follows:

1. Client shall pay Firm ███████████ on the first business day of the month, beginning on ███████████, and will be made by wire via the enclosed instructions or check to:

   CUMMINGS MANOOKIAN PLC
   Attn: Brian Manookian
   102 Woodmont Boulevard, Suite 241
   Nashville, TN 37205

   Client shall make the above payments each month for the full ███████ term of this Agreement, plus any extension or renewal. Client's termination of Firm's Services shall not release Client from the obligation to make the above monthly payments.

2. Unless otherwise agreed to in writing by the Firm, Client shall compensate Local Counsel directly pursuant to the terms of any Engagement Letter provided by Local Counsel.

3. Client shall reimburse firm for all expenses incurred in connection with any Claim as defined in Exhibit A. Such expenses shall include, but are not limited to, court fees, filing fees, expert witness costs and fees, travel expenses, copying costs, courier costs, and the like.

2



**Tre Hargett**
Secretary of State

**Division of Business Services**
**Department of State**
State of Tennessee
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102

## Filing Information

Name: **Diamond Integrity Standards Foundation**

### General Information

| | | | |
|---|---|---|---|
| **SOS Control #** | **000902362** | Formation Locale: | TENNESSEE |
| Filing Type: | Nonprofit Corporation - Domestic | Date Formed: | 05/04/2017 |
| | 05/04/2017 4:03 PM | Fiscal Year Close | 12 |
| Status: | Inactive - Terminated | | |
| Duration Term: | Perpetual | | |
| Public/Mutual Benefit: | Public | | |

**Registered Agent Address**
NO AGENT
AGENT RESIGNED OR INVALID
NASHVILLE, TN 37219

**Principal Address**
45 MUSIC SQ W
NASHVILLE, TN 37203-3205

The following document(s) was/were filed in this office on the date(s) indicated below:

| Date Filed | Filing Description | Image # |
|---|---|---|
| 07/21/2017 | Termination by Incorporators/Organizers | B0422-4740 |
| Filing Status Changed  From: Active  To: Inactive - Terminated | | |
| Inactive Date Changed  From: No Value  To: 07/21/2017 | | |
| 05/04/2017 | Initial Filing | B0387-9681 |

| Active Assumed Names (if any) | Date | Expires |
|---|---|---|



Exhibit B

12/13/2017 12:56:39 PM

Page 1 of 1

 GoDaddy™

 



**Partners**

## Search the WHOIS Database

Enter a domain name to search

Private Registration     Local listings

## WHOIS search results

Domain Name: DDVICTIMFUND.COM
Registry Domain ID: 2120754954_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2017-08-31T22:00:59Z
Creation Date: 2017-05-04T20:18:13Z
Registrar Registration Expiration Date: 2018-05-04T20:18:13Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited http://www.icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDeleteProhibited
Registry Registrant ID:
Registrant Name: Registration Private
Registrant Organization: Domains By Proxy, LLC
Registrant Street: DomainsByProxy.com
Registrant Street: 14455 N. Hayden Road
Registrant City: Scottsdale
Registrant State/Province: Arizona
Registrant Postal Code: 85260
Registrant Country: US
Registrant Phone: +1.4806242599
Registrant Phone Ext:
Registrant Fax: +1.4806242598
Registrant Fax Ext:
Registrant Email: ddvictimfund.com@domainsbyproxy.com
Registry Admin ID:
Admin Name: Registration Private
Admin Organization: Domains By Proxy, LLC
Admin Street: DomainsByProxy.com
Admin Street: 14455 N. Hayden Road



Exhibit C

 **GoDaddy™**    

**Partners**

## Search the WHOIS Database

Enter a domain name to search     Search

**Private Registration**     **Local listings**

## WHOIS search results

Domain Name: DDTAXFRAUD.COM
Registry Domain ID: 2132674244_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2017-08-31T22:00:59Z
Creation Date: 2017-06-10T20:26:04Z
Registrar Registration Expiration Date: 2018-06-10T20:26:04Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited http://www.icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDeleteProhibited
Registry Registrant ID:
Registrant Name: Registration Private
Registrant Organization: Domains By Proxy, LLC
Registrant Street: DomainsByProxy.com
Registrant Street: 14455 N. Hayden Road
Registrant City: Scottsdale
Registrant State/Province: Arizona
Registrant Postal Code: 85260
Registrant Country: US
Registrant Phone: +1.4806242599
Registrant Phone Ext:
Registrant Fax: +1.4806242598
Registrant Fax Ext:
Registrant Email: ddtaxfraud.com@domainsbyproxy.com
Registry Admin ID:
Admin Name: Registration Private
Admin Organization: Domains By Proxy, LLC
Admin Street: DomainsByProxy.com
Admin Street: 14455 N. Hayden Road



**Exhibit D**

Admin City: Scottsdale
Admin State/Province: Arizona
Admin Postal Code: 85260
Admin Country: US
Admin Phone: +1.4806242599
Admin Phone Ext:
Admin Fax: +1.4806242598
Admin Fax Ext:
Admin Email: ddtaxfraud.com@domainsbyproxy.com
Registry Tech ID:
Tech Name: Registration Private
Tech Organization: Domains By Proxy, LLC
Tech Street: DomainsByProxy.com
Tech Street: 14455 N. Hayden Road
Tech City: Scottsdale
Tech State/Province: Arizona
Tech Postal Code: 85260
Tech Country: US
Tech Phone: +1.4806242599
Tech Phone Ext:
Tech Fax: +1.4806242598
Tech Fax Ext:
Tech Email: ddtaxfraud.com@domainsbyproxy.com
Name Server: NS1.MD-IN-56.WEBHOSTBOX.NET
Name Server: NS2.MD-IN-56.WEBHOSTBOX.NET
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2017-12-19T20:00:00Z <<<

For more information on Whois status codes, please visit https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

The data contained in GoDaddy.com, LLC's WHOIS database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, LLC. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section. In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.

See Underlying Registry Data
Report Invalid Whois

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DIAMOND CONSORTIUM, INC. d/b/a THE DIAMOND DOCTOR and DAVID BLANK, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 4:16CV94-ALM |
| BRIAN MANOOKIAN, CUMMINGS MANOOKIAN, PLC, and BRIAN CUMMINGS, | § § § § § | |
| Defendants. | § § | |

## OPINION AND ORDER REGARDING SANCTIONS

Pending before the Court is Plaintiffs' Emergency Motion for Order to Show Cause (Potential Contempt of Court and Sanctions) (the "Emergency Motion") (Dkt. 269), the motion having been referred to the undersigned pursuant to 28 U.S.C. § 636 (*see* Dkt. 288). Having considered the motion, as well as the responsive briefing thereto, and the evidence adduced during the Show Cause Hearing held on July 12, 2017, the Court is of the opinion that Plaintiffs' Emergency Motion (Dkt. 269), as supplemented by their additional briefings (Dkts. 306 and 310), should be **GRANTED** in part and **DENIED** in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed their Emergency Motion on June 27, 2017, stating they became aware of a Facebook advertisement sponsored by the Diamond Integrity Standards Foundation (the "DISF"), three (3) websites administered by the DISF, the proactive publication of said websites to witnesses and the press, and "robo-calls" targeting certain customers of Plaintiff Diamond Consortium, Inc. d/b/a The Diamond Doctor's ("Diamond Doctor"). Records obtained by

Exhibit E

Plaintiffs from the Tennessee Secretary of State show the DISF was incorporated by Defendant Brian Manookian ("Manookian") on May 4, 2017, and its registered agent is Defendant Cummings Manookian ("Cummings Manookian"). *See* Dkt. 271-2 (Sealed). It has also been established that the DISF's business address is the same as Cummings Manookian's address. *See* Dkt. 307, July 12, 2017, Hearing Transcript ("Hrg. Tr.") at 115:16-24.

In addition to asserting that the DISF is nothing more than an "alter ego" or "shell entity" controlled by Defendants (*see* Dkt. 310 at 1, 5), Plaintiffs allege Defendants have proactively publicized the DISF websites in an attempt to influence witnesses and improperly prejudice the jury pool against Plaintiff David Blank ("Blank").[1] *See* Dkt. 269.

Also at issue is how the DISF obtained Diamond Doctor's proprietary customer information—information which is arguably subject to the Court's Protective Order (*see* Dkt. 128). Diamond Doctor customer information, including customer names, contact information, and detailed purchase information, was published on the DISF websites and was also used to send solicitation emails and "robo-calls" to targeted Diamond Doctor customers. In addition, the DISF, or someone acting on its behalf, sent emails to the media and others, including Plaintiff Blank himself, alerting them to the DISF websites.

The primary issue before the Court, as articulated in Plaintiffs' Emergency Motion and clarified and/or amplified by the subsequent briefings, is whether the actions and activities attributed to the DISF were, in fact, orchestrated by Defendants to improperly influence witnesses and/or prejudice potential jurors, and whether the Court should impose sanctions for such actions.

---

[1]     Trial is set for August 15, 2017, and District Judge Amos Mazzant has explicitly stated the trial date will not be continued.

2

Plaintiffs' current pleading requests relief "in addition to the relief already requested" in their Emergency Motion, "including the award of reasonable and necessary attorney's fees." *See* Dkt. 310 at 8. However, the only relief specifically requested in the Emergency Motion is that the Court conduct a show cause hearing, which it has done. Plaintiffs did not specifically request attorney's fees in the Emergency Motion but have requested attorney's fees and expenses in their subsequent pleadings. *See* Dkts. 306 and 310. Thus, the Court will focus on the relief requested in Plaintiffs' current pleading (*see* Dkt. 310).

Plaintiffs ask the Court to impose sanctions against Defendants, pursuant to Rule 37(b)(2)(A)(i), (ii), and (vii), as follows:

> (a) finding that the actions of DISF are the actions of Defendants for purposes of this lawsuit; (b) holding that Defendants are prohibited from calling as witnesses any former customers of Diamond Doctor; (c) holding that Defendants are prohibited from offering a substantial truth defense to Plaintiffs' defamation, libel and business disparagement claims; (d) sanctioning Defendants for Plaintiffs' costs and fees incurred in pursuing the Emergency Motion and related discovery; and (e) Defendants be fined for every day they fail to disclose how they obtained the Diamond Doctor customer lists and which customers received "ringless voicemails" or were otherwise contacted by the DISF.

Dkt. 310 at 2.

Plaintiffs also seek a finding that Defendant Manookian is in contempt of court by failing to comply with the Court's July 13, 2017, and July 14, 2017, Orders (Dkts. 300 and 305).

## A.  THE DISF WEBSITES

### 1.  The DD Victim Fund Website

On or about May 10, 2017, Plaintiffs became aware of a Facebook advertisement sponsored by the DISF with a reference to the DD Victim Fund Website, http://ddvictimfund.com/. *See* Dkt. 269. According to Plaintiffs, the site states the "Victim Fund" is administered by the DISF. The site invites visitors to "claim your award" and also provides a

3

long list of Diamond Doctor customer names, dates of purchase, purchase prices, and detailed information about their diamonds.[2] It then links to a form for a *"Pro Se* Petition" against Diamond Doctor. The site invites customers to submit a "Declaration," so a representative of the "Victim Fund" can contact them. Plaintiffs allege the site contains links to the Cummings Manookian website: www.diamondlawsuit.com/dianddoctor/. Plaintiffs assert that although the DD Victim Fund Website has been down at times, it "reappears whenever strategically advantageous to Defendants in this lawsuit." *See* Dkt 269 at 2.

## 2.  The DD Sales Tax Fraud Website

According to Plaintiffs, on June 19, 2017, Defendants' counsel, Andres Correa ("Correa"), sent Plaintiffs' counsel, Bruce Steckler ("Steckler"), an email stating Defendants had uncovered that Diamond Doctor had not paid sales taxes on certain in-state diamond sales. Subsequently, Steckler was made aware of the DD Sales Tax Fraud Website, www.ddtaxfraud.com. The site plays the Chris Isaak song, "Baby Did a Bad, Bad Thing" and displays an animated caricature of Plaintiff Blank behind prison bars, holding diamonds in one hand and dollar bills in the other. The website proclaims "IT'S TIME TO PUT NOTORIOUS FRAUDSTER DAVID BLANK BEHIND BARS," and alleges, "We now know that he was also perpetrating a massive tax fraud on the State of Texas and the citizens of Dallas."

The site lists partial names of Diamond Doctor's customers, along with purported purchase amounts, dates of purchase, and partial phone numbers. *See* Dkt. 269 at 4. Plaintiffs allege someone anonymously purchased the internet domain for the Sales Tax Fraud Website on June 10, 2017. *Id.* Plaintiffs further allege the Sales Tax Fraud Website is "copyrighted" by the DISF. *Id.*

---

[2]       By way of example, the Court notes the DD Sales Tax Fraud Website contains five thousand two hundred and forty-three (5,243) Diamond Doctor customer records.

4

### 3.   The Sue David Blank Website

On July 8, 2017, Plaintiffs filed a supplement to their Emergency Motion (the "Emergency Motion Supplement") (Dkt. 284), stating they became aware of another "harassing website." *Id.* Although the name of the website was redacted, the third website is believed be the "Sue David Blank Website," also controlled by the DISF.

### B.  PUBLICATION OF THE DISF WEBSITES

Plaintiffs allege that on or about May 22, 2017, Defendants (and/or the DISF and/or someone acting on Defendants' behalf) engaged in an "automated robo-calling" campaign with recorded messages to Diamond Doctor customers, accusing Plaintiffs of fraud and directing recipients to the DD Victim Fund Website for purported compensation. Defendant Manookian admits that the DISF used a process called "ring-less voice mail"[3] to leave messages for approximately one hundred seventy-five (175) "specifically identified" Diamond Doctor customers informing them "they may have been victims of Diamond Doctor's fraud" (*see* Dkt. 279-9 at 2).

Plaintiffs also allege Defendants—or persons acting on their behalf—have sent anonymous emails to selected individuals to ensure they are aware of the Sales Tax Fraud Website. *See* Dkt. 269 at 5. Specifically, Plaintiffs allege such emails were sent to Ronnie Mervis, a witness expected to testify at trial, Rob Bates, a diamond industry reporter, and Kendra Shapiro, an independent Dallas-area jeweler, alerting them to the website. *See id.* Plaintiffs also allege that since June 10, 2017, Manookian personally made calls to two additional Diamond Doctor customers. *Id.* According to Manookian, he contacted three Diamond Doctor customers as part of his "investigation of evidence of fraud by Diamond Doctor." *See* Dkt. 279-9 at 3.

---

[3]     *See* Dkt. 307, Hrg. Tr. at 143:24-144:1.

According to Plaintiffs, they became aware of the "Sue David Blank Website" when Plaintiff Blank received an email, threatening a Federal raid and containing links to all three DISF-controlled websites. Around the same time, Robert Bates, the same jewelry industry reporter who had received an email alerting him to the Sales Tax Fraud Website, received an email from the DISF to "spread the word to defrauded consumers" and containing links to the same three DISF-controlled websites. Dkt. 284 at 2.

## C. THE PARTIES' BRIEFINGS AND THE SHOW CAUSE HEARING

The briefings related to the Emergency Motion have been extensive, consisting of the following documents:

1. Plaintiffs' Sealed Appendix in support of the Emergency Motion (Dkt. 271);

2. Defendants' Response to the Emergency Motion (Dkt. 279) with exhibits thereto;

3. Plaintiffs' Reply to Defendants' Response (Dkt. 280);

4. Plaintiffs' Supplement in support of the Emergency Motion (Dkt. 284); and

5. Plaintiffs' Sealed Appendix in support of their Supplement (Dkt. 285).

After the Show Cause Hearing on July 12, 2017, the Court determined it needed additional briefing and discovery, and issued the following Orders:

1. Plaintiffs were ordered to file a brief explaining in further detail their requested relief and the rationale for said relief by July 17, 2017, at 5:00 p.m. Defendants' response, if any, was due by July 19, 2017, at 5:00 p.m.

2. Defendant Manookian was ordered to submit to Plaintiffs the name of a DISF corporate representative whom Plaintiffs could depose, as well as proposed deposition dates no later than July 26, 2017, by July 17, 2017, at 5:00 p.m.

3. Defendant Manookian was ordered to submit to Plaintiffs the names of the one hundred seventy-five (175) Diamond Doctor customers who received "ring-less voicemails" from the DISF, as well as the names of any other Diamond Doctor customers who received similar voicemails from the DISF or anyone acting on the DISF's behalf or at the DISF's direction, by July 17, 2017, at 5:00 p.m.

4. Finally, Defendant Manookian was ordered to submit to the Court by July 17, 2017, at 5:00 p.m., for *in camera* inspection, any and all documents related to his

6

association with the DISF. The Order specifically stated a non-exclusive list of documents to include the following: engagement/retainer agreement; copies of any payments received; correspondence to, from, or in any way related to the alleged client and/or client relationship; notes, emails, or other documents in any way related to conversations, communications, instructions, or advice sought or provided; and any other form of information, in whatever format (e.g. digital, hardcopy, etc) that bears on the identification of the client and the legal advice allegedly sought or received from Manookian.

Dkts. 300 and 305.

The following briefings were filed in response to the Court's Orders:

1. Plaintiffs' Brief in Support of Relief Requested Regarding their Emergency Motion to Show Cause (Dkt. 306) with exhibits thereto;

2. Defendants' Response to Plaintiffs' Brief in Support of Relief Requested Regarding Their Emergency Motion to Show Cause (Dkt. 308);

3. Plaintiffs' Notice of Defendants' Non-Compliance with the Court's July 13, 2017 and July 14, 2017 Orders and Supplemental Briefing Regarding Requested Remedies (Dkt. 310) with exhibits thereto;

4. Defendants' Response to Plaintiffs' Notice of Non-Compliance with the Court's July 13, 2017 and July 14, 2017 Orders and Supplemental Briefing Regarding Requested Remedies (Dkt. 313) with an exhibit thereto; and

5. Plaintiffs' Reply to Defendants' Response to Plaintiffs' Notice of Non-Compliance with the Court's July 13, 2017 and July 14, 2017 Orders and Supplemental Briefing Regarding Requested Remedies (Dkt. 314) with exhibits thereto.

Plaintiffs filed their brief as ordered on July 17, 2017 (Dkt. 306), and Defendants timely filed a response on July 19, 2017 (Dkt. 308). In response to the Court's order for Manookian to provide Plaintiffs the name of the DISF corporate representative and the names of the one hundred seventy-five (175) Diamond Doctor customers receiving robo-calls—or any Diamond Doctor customers contacted by the DISF, Manookian, or someone on their behalf—Chris Schwegmann, counsel for Defendants, sent Plaintiffs an email on July 21, 2017, informing them that Manookian no longer represents the DISF and stating that:

1. the corporate representative of the DISF is Felipe Debase [sic], and Manookian cannot, himself, compel any testimony from Mr. DeMase;

2. [Manookian] does not have a list of the 175 names in his possession, custody, or control. They may be obtained from the DISF, which has already been subpoenaed in the Middle District of Tennessee; and

3. Apart from the names disclosed in his declaration, [Manookian] has no knowledge of any other Diamond Doctor customers who received similar voicemails from the DISF or anyone acting on its behalf.

Dkt. 310-1.

Plaintiffs also advised the Court that the DISF is no longer an active business entity in the State of Tennessee, having been "terminated" by the incorporators as of July 21, 2017. *See* Dkt. 310-2.

The only relevant documents Manookian submitted to the Court for *in camera* review was a copy of an "attorney-client agreement" purportedly signed by "DeMase" on June 7, 2017, and a copy of a letter from the Tennessee Secretary of State confirming the successful filing of the DISF registration documents, dated June 8, 2017. No other details about Manookian's attorney-client relationship with the DISF and DeMase were provided. Defendants also submitted a copy of Defendants' motion to quash Plaintiffs' subpoena filed in the Middle District of Tennessee,[4] but the relevance and purpose of that document as it relates to Manookian's compliance with this Court's Order is unclear since the Court advised the parties during the hearing that it was aware of and had reviewed the motion to quash.

## II. <u>LEGAL STANDARD</u>

### A. CONTEMPT

"A party may be held in contempt if he violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of

---

[4]    Middle District of Tennessee Case No. 3:17-mc-00008, Dkt. 1.

that order." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987). "The judicial contempt power is a potent weapon" that should not be used unless a specific aspect of the court's order has been "clearly violated." *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 383 (5th Cir. 1999). The purpose of a civil contempt order is: "(1) to coerce compliance with a court order; or (2) to compensate a party for losses sustained as a result of the contemnor's actions." *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 290-91 (5th Cir. 2002).

To show that civil contempt is warranted, a moving party must establish that: (1) a court order was in effect; (2) the order required certain conduct by the respondent; and (3) the respondent failed to comply with the court's order. *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992). Intent is not an element of civil contempt; the issue is whether the alleged contemnor has complied with the court's order. *See Whitfield*, 832 F.2d at 913. The standard of proof for civil contempt is clear and convincing evidence, which is "that weight of proof which produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotation marks omitted).

"After the movant has shown a *prima facie* case, the respondent can defend against it by showing a present inability to comply with the subpoena or order." *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987). "Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production." *United States v. Rylander*, 460 U.S. 752, 757 (1983). Additionally, "[t]he respondent may avoid a contempt finding by establishing that it has substantially complied with the order or has made reasonable efforts to comply." *In re Brown*, 511 B.R. 843, 849 (S.D. Tex. 2014) (citing *U.S.*

*Steel Corp. v. United Mine Workers of Am., Dist. 20*, 598 F.2d 363, 368 (5th Cir. 1979)). And, "[e]ven if liability is established, the respondent may demonstrate mitigating circumstances that might persuade the Court to withhold the exercise of its contempt power." *Id.* (citing *Whitfield*, 832 F.2d at 914).

"Upon a finding of civil contempt, the Court has broad discretion to impose judicial sanctions that would coerce compliance with its orders and compensate the moving party for any losses sustained." *Mary Kay Inc. v. Designs by Deanna, Inc.*, 2013 WL 6246484, at *4 (N.D. Tex. 2013) (citations omitted). The Court may impose a reasonable fine and/or a fixed term of imprisonment, with the condition that the contemnor be released if he or she complies with the court order. *Id.* The Court also may require the contemnors pay reasonable attorney's fees incurred by the movant in obtaining the contempt finding. *Id.*

## B. SANCTIONS

Rule 37(b)(2)(A) provides "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." FED. R. CIV. P. 37(b)(2)(A). A district court has broad discretion to determine an appropriate sanction under Rule 37(b), *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990), which may include an order directing that certain designated facts be taken as true, prohibiting the disobedient party from supporting or opposing designated claims or defenses, striking pleadings in whole or in part, dismissing the action in whole or in part, rendering a default judgment against the disobedient party, or treating the failure to obey the order as contempt of court. *See* FED. R. CIV. P. 37(b)(2)(A)(1).

The court must impose the least severe sanction that will achieve the deterrent value of Rule 37. *See United States v. Garrett*, 238 F.3d 293, 298 (5th Cir. 2000). A finding of bad faith

or willful misconduct is required to support severe sanctions such as an order striking pleadings or dismissing a case. *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 73d 486, 488–89 (5th Cir. 2012) (citing *Pressey*, 898 F.2d at 1021). Lesser sanctions do not require a finding of willfulness. *Id.* Instead of, or in addition to, any sanction permitted by Rule 37(b), "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(b)(2)(C).

Additionally, the availability of other sanctioning mechanisms does not prevent the court from exercising its inherent power to grant the victim further relief if the ends of justice require it. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-51 (1991). "[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* at 50.

In order to exercise its inherent authority, the court must find the accused party engaged in bad faith conduct that resulted in prejudice to the judicial process. *See Chambers*, 501 U.S. at 45–46. These inherent powers "ought to be exercised with great caution," *id.* at 43 (internal quotation marks omitted), and are reserved for "conduct which abuses the judicial process." *Id.* at 44–45. "The threshold for the use of the inherent power sanction is high." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). A court's inherent powers to sanction "may be exercised only if essential to preserve the authority of the court," *id.*, and only when the court "finds that 'fraud has been practiced upon it, or that the very temple of justice has been defiled.'" *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005

(5th Cir. 1995) (quoting *Chambers*, 501 U.S. at 46). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.

## III.   ANALYSIS

To reiterate, Plaintiffs' seek the imposition of sanctions against Defendants pursuant to Rule 37(b)(2)(A)(i), (ii), and (vii) and a finding that Defendant Manookian is in contempt of court by failing to comply with the Court's July 13, 2017, and July 14, 2017, Orders (Dkts. 300 and 305).

### A.   CONTEMPT

Although prior pleadings, as well as argument presented at the Show Cause Hearing, suggest that Plaintiffs seek a finding of contempt based on Defendants' alleged publication of Diamond Doctor customer information on the DISF websites, a putative violation of the Court's Protective Order, Plaintiffs appear to have abandoned that request, in favor of a contempt finding based on Defendant Manookian's failure to comply with the Court's July 13, 2017, and July 14, 2017, Orders.[5] *See* Dkt. 310.

Under 28 U.S.C. § 636(e), the magistrate judge's authority is to certify the facts, not issue an order of contempt. 28 U.S.C. § 636(e)(6)(B)(iii). The magistrate judge's role is "to determine whether the moving party can adduce sufficient evidence to establish a *prima facie* case of contempt." *Church v. Steller*, 35 F. Supp. 2d 215, 217 (N.D.N.Y. 1999) (citing *Proctor v. State Gov't of N.C.*, 830 F.2d 514, 521 (4th Cir. 1987)). Based on the record before it, the Court does not find sufficient evidence to establish that Defendant Manookian violated the Court's Orders.

Furthermore, even if Plaintiffs could establish a *prima facie* case, Defendants argue that Manookian has substantially complied with the Order. "[A] respondent may avoid a contempt

---

[5]    Although Plaintiffs ask the Court to make a finding that Defendants willfully participated in disclosing personal information of Diamond Doctor customers in violation of this Court's Protective Order, (*see* Dkt. 310 at 9), they do not argue for a contempt finding on this basis. *See* Dkt. 310.

finding by establishing that it has substantially complied with the order or has made reasonable efforts to comply." *In re Brown*, 511 B.R. 843, 849 (S.D. Tex. 2014) (citing *U.S. Steel*, 598 F.2d at 368). Defendants argue that because Manookian supplied documents for *in camera* review, supplied the name of a DISF representative, and disclosed the names of the three Diamond Doctor customers he personally called he was in substantial compliance. *See* Dkt. 313 at 5-6.

In addition to a showing of substantial compliance, a respondent can defend against a movant's *prima facie* case by showing an inability to comply with the subpoena or order. *Petroleos Mexicanos*, 826 F.2d at 401. Defendants argue Manookian could not "disclose the 175 persons contacted by DISF, or force a DISF representative to appear at a deposition" because "that information does not belong to [Manookian], and even advising the DISF to provide it is a violation of the fiduciary duty he owes to DISF to act at all times in its best interest." *See* Dkt. 313 at 5-6. Thus, Defendants argue Manookian supplied the information he could in light of his obligation to protect the DISF's privileged information. *Id.*

As will be discussed further below, although the Court is not persuaded that Defendants' explanations are entirely credible, the Court declines to recommend a finding of contempt against Defendant Manookian at this time. Accordingly, Plaintiffs' request for a finding, pursuant to Rule 37(b)(2)(A)(vii), that Defendant Manookian is in contempt of Court by failing to comply with this Court's July 13, 2017, and July 14, 2017, Orders is **DENIED**.

### B.  SANCTIONS

Plaintiffs ask the Court to issue sanctions and award reasonable and necessary attorney's fees pursuant to Rule 37(b)(2)(A)(i) and (ii).[6] Specifically, under Rule 37(b)(2)(A)(i), Plaintiffs request the Court to designate that facts at issue regarding the DISF and its relationship to Defendants be taken as established and make a finding for the purposes of this action that:

---

[6]  Plaintiffs' Rule 37(b)(2)(A)(vii) request for a finding of contempt of court was addressed above.

1. Defendant Manookian was totally lacking in credibility in his testimony before this Court;

2. DISF is the alter-ego and/or an instrument of Defendants, controlled and used by Defendants to advance their personal interests and to avoid compliance with the rules of discovery and this Court's Protective Order;

3. Defendants have willfully and in bad faith failed to comply with the July 13 and July 14 Orders;

4. Defendants have willfully obstructed the Court's efforts to determine how DISF obtained the Diamond Doctor customer information;

5. Defendants have willfully obstructed the Court's efforts to determine which Diamond Doctor customers received voicemails from DISF;

6. Defendants have willfully participated in contacting—and disclosing personal information of—Diamond Doctor customers in violation of this Court's Protective Order;

7. Defendants have willfully failed to comply with legitimate discovery requests of Plaintiffs; and

8. Defendants have willfully attempted to tamper with potential witnesses and influence potential members of the jury panel in this case.

Dkt. 310 at 8-9.

In addition to arguing there is no evidence of misconduct by Manookian, Defendants argue "Plaintiffs violated, blatantly and hypocritically, the Protective Order they [now] ask this Court to enforce" (Dkt. 313 at 5), an allegation which, unsurprisingly, Plaintiffs deny. As explained above, although the Court is concerned that the Diamond Doctor customer information somehow got into the hands of "DeMase" in violation of the Court's Protective Order, because the Court's opinion herein is not based on a violation of the Protective Order, Defendants' allegation that Plaintiffs also violated the Protective Order is irrelevant.

Relying on Rule 37(b)(2)(A)(ii), Plaintiffs request that Defendants be prohibited from supporting or offering any evidence in support of their substantial truth defense to Plaintiffs'

defamation, libel, and business disparagement allegations.[7] *See* Dkt. 310 at 9. Plaintiffs argue that Defendants' willful failure to comply with the Court's July 13, 2017, and July 14, 2017, Orders regarding discovery of the source of Diamond Doctor customer information in the DISF's possession warrants the striking of that defense and the introduction of any testimony from any former Diamond Doctor customers. *Id.*

Defendants argue Plaintiffs are not entitled to any relief because: (1) there is no evidence of any misconduct by either Manookian or Cummings Manookian; (2) Manookian's professional duties prohibit him from disclosing the information the Court ordered him to disclose; and (3) the requested sanctions do not meet the Fifth Circuit's justice and relevance requirements because they have no connection to the alleged misconduct.

### 1. Rule 37(b)(2) Sanctions

Under Rule 37(b)(2)(A), sanctions may be sought for failure to obey a discovery order:

> If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.

FED. R. CIV. P. 37(b)(2)(A). The court may issue orders:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims, and

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.

FED. R. CIV. P. 37(b)(2)(A)(i) (ii).

Rule 34 requires that a responding party produce responsive documents that are within their "possession, custody or control." Documents are deemed to be within the "possession,

---

[7]     According to Plaintiffs, Defendants have consistently taken the position that all Diamond Doctor customers are potential witnesses who can establish the truth of Defendants' fraud and "overgrading" allegations against Plaintiffs and, therefore, support their defense of truth or substantial truth. *See* Dkt. 310 at 9.

custody or control" of a responding party if that party either has "actual possession, custody or control" of the documents or if that party "has the legal right to obtain the documents on demand or has the practical ability to obtain the documents from a non-party to the action." *Estate of Monroe v. Bottle Rock Power Corp.*, 2004 WL 737463, at *10 (E.D. La. 2004).

"Rule 34 is broadly construed and documents within a party's control are subject to discovery, even if owned by a nonparty." *Id.* (citing *Commerce and Indus. Ins. Co. v. Grinnell Corp.*, 2001 WL 96337, at *3 (E.D. La. 2001)). The burden, however, is on the party seeking discovery to make a showing that the other party has control over the documents sought. *Id.* Typically, what must be shown to establish control over documents in the possession of a non-party is that there is "a relationship, either because of some affiliation, employment or statute, such that a party is able to command release of certain documents by the non-party person or entity in actual possession." *Id.*; *see also Shell Global Solutions (US) Inc. v. RMS Eng'g, Inc.*, 2011 WL 3418396, at *2 (S.D. Tex. 2011) ("Among the factors used by courts to determine whether one corporation may be deemed under control of another corporation are: (a) commonality of ownership, (b) exchange or intermingling of directors, officers or employees of the two corporations, (c) exchange of documents between the corporations in the ordinary course of business, (d) any benefit or involvement of the nonparty corporation in the transaction, and (e) involvement of the non-party corporation in the litigation."). Courts have ordered corporate parties to produce documents in the possession of corporate relatives—such as parent, sibling, or subsidiary corporations. *See Steel Software Sys. Corp. v. DataQuick Info. Sys., Inc.*, 237 F.R.D. 561, 564 (D. Md. 2006).

The Court has already concluded that Manookian complied with the letter, though not the spirit and intent, of the Court's July 13, and July 14, Orders. And even broadly construing Rule

34, the Court is not satisfied there is sufficient evidence to establish that Manookian had control over the customer information allegedly in the possession of the DISF. Thus, the Court finds there is insufficient bases to impose sanctions under Rule 37. However, Defendant Manookian's behavior in the context of the actions he attributes to the DISF demonstrates the necessity for the Court to draw on its inherent power to address Manookian's pattern of obfuscation regarding the DISF, his offering of inconsistent information about his relationship to, and representation of, the DISF, and his failure to provide credible explanations about how the DISF obtained Diamond Doctor customer information.

## 2.   The Court's Specific Finding of Bad Faith

As explained above, the Court has inherent power to sanction parties that engage in conduct that constitutes fraud on the court or an abuse of the judicial process. *Chambers*, 501 U.S. at 44-45; *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001). The Court must make a specific finding that the sanctioned party acted in bad faith, and any sanctions imposed should be the least severe sanctions adequate to accomplish the purpose for which the sanction was imposed. *See Topalian v. Ehrman*, 3 F.3d 931, 938 (5th Cir. 2001). Furthermore, the Court's inherent power is not displaced by any rule or statute. *Chambers*, 501 U.S. at 46.

The Court finds the following actions and conduct by Defendant Manookian constitute bad faith: (1) his representation of the DISF and the mysterious Felipe DeMase; (2) his knowledge, involvement, and/or facilitation of the DISF's procurement of  Diamond Doctor customer information; (3) his involvement in the establishment of the DISF websites which look identical to, and contain links to, Cummings Manookian websites; (4) the publication of Diamond Doctor customer information on the DISF websites; (5) his knowledge, involvement, and/or facilitation of targeting  the Diamond Doctor customers who received ring-less voicemails

from the DISF; and (6) the sudden termination of his representation of the DISF and the deactivation of the DISF as a business entity on the very day Manookian was to provide Plaintiffs with the name of a corporate representative to answer the subpoena in the Middle District of Tennessee.

It has been established that the DISF has in its possession thousands of customer names and has used ring-less voice mail to contact at least one hundred seventy-five (175) of those customers. Further, Manookian testified he relied upon the DISF customer databases to investigate potential sales tax fraud claims against Plaintiffs. Manookian's representations that the DISF is a nonparty entity separate and distinct from Manookian and Cummings Manookian, and that neither Manookian nor Cummings Manookian have possession, custody, or control of any Diamond Doctor customer information, lack credibility.

Defendants' primary argument in opposition to Plaintiffs' request for sanctions is the lack of evidence of any misconduct by Manookian or Cummings Manookian. However, the Court is persuaded there is sufficient evidence of bad faith conduct that interferes with the judicial process. Based on the record before the Court, it appears likely that, for all intents and purposes, Manookian and/or Cummings Manookian, are one and the same as the DISF. At the very least, Manookian orchestrated the circumstances allowing for the creation of the DISF and the publication of the DISF websites containing Diamond Doctor customer information, either by using DeMase as a "straw man" or by concocting a fake identity for Demase, the purported "Director" of the DISF, and its only known corporate representative. Manookian testified that DeMase, allegedly a dual citizen of Italy and Argentina, contacted Manookian through the Cummings Manookian website, and that it was DeMase who provided the Diamond Doctor customer information to the DISF. *See* Dkt, 307, Hrg. Tr. at 116:11-117:3.

Manookian further testified he does not know if DeMase was ever a Diamond Doctor customer (*id.* at 117:10-12). When questioned about whether he knew the reason DeMase was interested in setting up the DISF, Manookian replied he did know but asserted the information is privileged. *See id.* at 117:24-188:5. Manookian maintains the DISF has established a "Victim Fund," but he does not know how much is in the Fund. *See id.* at 119:121-120:1. Although Manookian testified he did not know how DeMase obtained the Diamond Doctor customer information (*id.* at 123:19-124:5, 124:6-9), he admitted to knowing how the customer information was published on the DISF websites (*id.* at 123:22-23). Manookian also asserted attorney-client privilege when questioned about how the one hundred seventy-five (175) customers who received ring-less voice mail messages from the DISF were selected (*id* at 143:21:23), but admitted he provided the parameters used to select the targeted customers. *See id.* at 152:15-153:8.

The timing of the creation of the DISF websites and the proactive publication of the sites to potential witnesses and the press is even more troubling in light of the fact the trial in this case is set to begin on August 15, 2017. The Court has an obligation to protect the integrity of the judicial process and, in particular, the integrity of a jury trial; and there is strong evidence here that Defendants' efforts to publicize the existence of these websites are a deliberate attempt to disrupt that process by improperly influencing witnesses and/or prejudicing the jury pool. Defendants' assertion that there is no proof that any jury *venire* members were contacted (*see* Dkt. 279 at 11) is irrelevant, given that potential and actual jurors may be tempted to use the Internet to search for information about the litigants—in spite of being warned by the court not to do so. Accordingly, the Court finds the timing and publication of these websites—with

19

Manookian's help and/or approval—further support a finding of Manookian's bad faith conduct in abuse of the judicial process.

Aside from the implausibility of Manookian's explanations regarding the identity of DeMase and why DeMase would be motivated to incorporate, operate, and fund the DISF, and to publish Diamond Doctor customer information on its websites, Manookian's actions in response to the Court's Orders of July 13, and July 14, 2017, further warrant a finding that Manookian acted in bad faith.

The Court's July 13, 2017, Order directed Manookian to submit for *in camera* review documents to establish his representation of the DISF and to support his assertions of attorney-client privilege regarding the customer information in the DISF's possession, as well as to establish that the asserted privilege is not subject to the crime-fraud exception. *See* Dkt. 300 at 6. Thus, the Court's Order was specifically tailored to achieve this objective. *Id*. Manookian submitted an "attorney-client agreement" allegedly signed by "DeMase" on June 7, 2017 (the "Client Agreement"). The Court first notes the Client Agreement is nothing more than a generic engagement letter. None of the requested additional details about Manookian's relationship with the DISF and DeMase were provided. Furthermore, the date of the Client Agreement is suspicious. In addition to the Client Agreement, Manookian also submitted a copy of a letter from the Tennessee Secretary of State, dated June 8, 2017, confirming the successful filing of the DISF registration documents. Thus, the Agreement is dated one day prior to the State of Tennessee's approval of the DISF's incorporation. However, the record shows that Manookian filed the DISF's incorporation application on May 4, 2017 (*see* Dkt. 298-10 at 3), more than a month prior to the date DeMase purportedly signed the Client Agreement.

Furthermore, Plaintiffs first became aware of the DISF websites on or about May 10, 2017, and the ring-less voice mail calls occurred on or about May 22, 2017. Thus, the Court reaches the inescapable conclusion that the documents provided to the Court for *in camera* review do not accurately reflect the sequence of events relating to Manookian's representation of the DISF. Moreover, the nexus of the June 7, 2017, date the Client Agreement was purportedly executed by DeMase and the June 8, 2017, date the DISF's incorporation was approved by the State of Tennessee leads the Court to conclude the Client Agreement was created after the fact, in specific response to the Court's Order. The Court thus finds Manookian's conduct constitutes fraud and an abuse of the judicial process. *See Chambers*, 501 U.S. at 44-45.

In response to the Court's Orders to provide Plaintiffs with the name of the DISF corporate representative whom Plaintiffs could depose in response to their subpoena, Manookian now advises he suddenly no longer represents the DISF (*see* Dkt. 310-1), that he cannot compel any testimony from DeMase (*id.*), and the DISF's status as a registered entity in the State of Tennessee has been terminated (*see* Dkt. 310-2), coincidentally on July 21, 2017, the very date Manookian was due to comply with the Court's Orders. These events further support the Court's finding of bad faith.

Defendants assert "it became impossible for Manookian to comply in full with this Court's Order and also comply in full with his fiduciary duties to his client" and, therefore, "Manookian did the only thing he could do: provide to Plaintiffs any information he actually could provide, and immediately terminate his attorney-client relationship with [the] DISF." *See* Dkt. 313 at 3. Defendants completely mischaracterize the Court's Orders. It was Manookian who assured the Court he would "promptly and expeditiously" ensure the availability of a DISF corporate representative for Plaintiffs to depose. *See* Dkt. 307, Hrg. Tr. at 139:17-19. The

21

Court's review of information about Manookian's representation of the DISF was to be done *in camera*, so Defendants' arguments in that regard are disingenuous.

The only Order that could have possibly raised an issue as to Manookian's obligations to his client was the Order to provide the names of the one hundred seventy-five (175) Diamond Doctor customers who received ring-less voice mail messages. However, rather than explaining their inability to comply or seeking further relief from the Court regarding this issue, Defendants simply "tossed out the baby with the bathwater" and refused to take any good faith steps toward compliance. Thus, Defendants' actions appear to be deliberately calculated to conceal information from the Court.

There is also significant evidence before the Court that Manookian and/or Cummings Manookian controlled the DISF websites. The websites have almost identical content, color, patterns, layout, etc. Defendant Manookian testified he reviewed the content of the DISF websites, provided certain information to be published on the DISF websites,[8] and approved the use of links to the Cummings Manookian website. *See* Dkt. 307, Hrg. Tr. at 148:9-12; 148:19-149:21. Finally, the Court finds it curious that the only websites the DISF has ever posted are the three websites aimed at Plaintiffs. Thus, it seems the DISF had no other reason to exist but to publicize negative information about Plaintiffs very close to the start of trial.

Whatever damage has been done by the DISF websites (which the Court notes remain active as of the date of this Opinion), the publication of Diamond Doctor customer information on the DISF websites, the ring-less voice mails by the DISF, and the emails and other communications (known and unknown) to customers, potential witnesses, members of the press, and others cannot be undone. In all likelihood, the names of the Diamond Doctor customers

---

[8] However, Manookian denes providing the Diamond Doctor customer information published on the websites. *See* Dkt. 307, Hrg. Tr. at 150:3-4.

22

contacted will remain unknown, and how the DISF obtained the Diamond Doctor customer information published will also remain unknown.

Finally, as a licensed and practicing attorney, Manookian is an officer of the Court. Despite his role as a party, he is still bound by ethical duties, such as the duty of candor toward a tribunal,[9] and the duty not to engage in conduct constituting obstruction of justice.[10] *See Cohn v. Commission for Lawyer Discipline*, 979 S.W.2d 694, 697 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("[a] lawyer shall not . . . violate these rules . . . whether or not such violation occurred in the course of a client-lawyer relationship"). Throughout these proceedings, Manookian has feigned adherence to ethical rules, while seemingly using those same ethical rules as a pretense to thwart the Court's efforts to make a thorough and informed inquiry. Manookian's conduct regarding the information he provided to the Court concerning his representation of the DISF is particularly troubling—and even further justifies the Court's finding of bad faith.

### 3. Determination of Appropriate Sanctions

After finding that Manookian acted in bad faith and disrupted the litigation process, the Court must determine an appropriate sanction for Manookian's behavior. In *Thomas v. Capital Security Services*, 836 F.2d 866 (5th Cir. 1988) (en banc), the Fifth Circuit outlined the procedures and standards for imposing sanctions under Rule 11. In *Topalian v. Ehrman*, 3 F.3d 931, 936 n.5, the Fifth Circuit refined the *Thomas* principles and determined they should "apply across-the-board to all of the district court's sanction powers." In *Thomas*, the Fifth Circuit set forth the over-arching principle that sanctions should be tailored to fit the particular wrong. *Thomas*, 836 F.2d at 877. Accordingly, "the district court should carefully choose sanctions that

---

[9]   *See, e.g.*, ABA Model Rule 3.03(a).
[10]  *See, e.g.*, ABA Model Rule 8.4.

foster the appropriate purpose of the rule [namely, the source of sanctioning power], depending upon the parties, the violation, and the nature of the case." *Id.*

Sanctions pursuant to a court's inherent authority serve the "dual purpose of vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy." *Carroll v. Jaques*, 926 F. Supp. 1282 (E.D. Tex. 1996), *aff'd sub nom. Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290 (5th Cir. 1997) (citing *Chambers*, 501 U.S. at 46 (internal quotation marks omitted)). In this context, "vindicating judicial authority" relates back to the purpose of inherent power:

> For nearly as long as the federal courts have existed, it has been understood that certain implied powers must necessarily result to our courts of justice from the nature of their institution, powers which cannot be dispensed with in a court because they are necessary to the exercise of all others. The inherent powers of the federal courts are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

*Natural Gas Pipeline*, 2 F.3d at 1406. (internal quotation marks and citations omitted). "The ultimate touchstone of inherent power is necessity." *Id.* at 1412.

The court in *Topalian* set forth four factors the district court must use in determining the appropriate sanction. *See Topalian*, 3 F.3d at 936–37; *see also Collie v. Kendall*, 1999 WL 462327, at *4–5 (N.D. Tex. July 6, 1999); *Taylor v. Cnty. of Copiah*, 937 F.Supp. 580, 584 (S.D. Miss. 1995). First, the court "must announce the sanctionable conduct giving rise to its order." *Topalian*, 3 F.3d at 937. As discussed above, Defendants, and in particular, Defendant Manookian, engaged in a pattern of obfuscation regarding the DISF, Manookian's relationship to, and representation of, the DISF, and Manookian's failure to provide credible explanations about how the DISF obtained Diamond Doctor customer information. The Court also found that

Defendants controlled the DISF websites and either provided or facilitated the publication of Diamond Doctor customer information on those websites. Further, the websites came into existence of the heels of the upcoming trial in this case.

Second, the court must address the connection between the sanctions the court imposes and the sanctionable conduct. *Topalian*, 3 F.3d at 937. As stated above, Defendants orchestrated or facilitated the publication of Diamond Doctor customer information on the DISF websites, as well as other inappropriate communications with Diamond Doctor customers who are potential witnesses at trial, creating the need for Plaintiffs' Emergency Motion for a show cause hearing, thus incurring attorney's fees for Plaintiffs, as well as expending judicial resources. Furthermore, Defendants' behavior after the Show Cause Hearing essentially amounted to a flouting of the Court's Orders. Not only did Manookian renege on his commitment to provide the name of a DISF corporate representative whom Plaintiffs could depose, he terminated his representation of the DISF, terminated the DISF as a registered business entity, and provided untrustworthy information to the Court regarding his representation of the DISF, incurring further attorney's fees for Plaintiffs and further expending judicial resources.

Third, the court must review whether the costs or expenses were "reasonable," as opposed to self-imposed, mitigable, or the result of delay in seeking court intervention. *Topalian*, 3 F.3d at 937. In this case, Plaintiffs filed their subpoena to the DISF on June 23, 2017, and their Emergency Motion on June 27, 2017. Plaintiffs assert they became aware of the DISF Facebook advertisement with a reference to the DD Victim Fund Website on or about May 10, 2017. *See* Dkt. 289 at 2. Plaintiffs became aware of the ring-less voice mail calls on or about May 22, 2017, and they were notified of the DD Sales Tax Fraud Website on June 19, 2017. *See* Dkt. 289. They became aware of the Sue David Blank Website or about July 7, 2017. *See* Dkt. 284. Thus, it

appears the DISF-initiated actions were multi-pronged and staged periodically over the course of a few weeks. Defendants argue that Plaintiffs *could have* more timely issued their subpoena to the DISF and/or *could have* served discovery on Defendants rather than filing a motion for a show cause hearing. *See* Dkt. 308 at 2 (emphasis added). However, the record before the Court indicates Plaintiffs conducted due diligence to determine the origins of the offending websites before filing their Emergency Motion. They explored the websites and tested their various links; they contacted Defendants' counsel to find out what they knew about the disclosure of Diamond Doctor customer information on the websistes; and they contacted the Tennessee Secretary of State to determine the identity of the DISF. Based on the foregoing, the Court finds that Plaintiffs acted reasonably under the circumstances.

Finally, the court must consider whether the sanction imposed is the least severe sanction adequate to achieve its intended purpose, deter similar conduct, both specifically and generally, and preserve the integrity of the Court. *See Topalian*, 3 F.3d at 937. Inherent power sanctions are essentially punitive, designed to penalize bad faith abuses of the litigation process. *Carroll*, 926 F.Supp at 1291. While they may be used to compensate the opposing party for fees that should never have been incurred, their compensatory aspect is only incidental, and it is within the discretion of the court to determine the appropriate sanction. *Id.* Among the types of inherent power sanctions that the court, in its discretion, may choose to impose are:

(1) a fine;

(2) an award of reasonable attorneys' fees and expenses;

(3) disqualification of counsel;

(4) preclusion of claims or defenses or evidence;

(5) dismissal of the action;

(6) entry of a default judgment;

26

(7) suspension of counsel from practice before the court or disbarment;

(8) vacatur of a judgment for fraud;

(9) injunctive relief limiting a person's future access to the courts;

(10) a contempt citation; and

(11) permitting adverse inference from document destruction.

*Id.* (citing GREGORY P. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE 440–41 (2d ed. 1994) (internal citations omitted).

Based on the record before the Court, it is more likely than not that the DISF is an alter ego controlled by Defendants, and Felipe DeMase is a fictitious individual. At the very least, Defendants have deliberately obstructed the Court's efforts to determine how the DISF came into possession of the Diamond Doctor customer information, and Defendant Manookian has offered disingenuous testimony and untrustworthy documents in response to the Court's efforts to establish the nature and scope of his alleged representation of the DISF and Felipe DeMase. Furthermore, the creation and publication of the DISF websites appears to have been deliberately timed to interfere with or improperly influence potential jurors and witnesses. Accordingly, the Court finds Defendants' bad faith behavior constitutes an abuse of the judicial process that warrants the imposition of sanctions under the Court's inherent powers.

Accordingly, the Court finds that an award of Plaintiffs' attorneys' fees is appropriate. The Court further finds that Defendants should be precluded from calling as witnesses any Diamond Doctor customers obtained through the DISF websites and other communications at issue herein. Finally, the Court finds that Defendants must remove the Diamond Doctor customer information from the DISF websites, or else be assessed a fine for their failure to do so. Having considered the available sanctions in light of the *Topalian* factors and other relevant authority, the Court determines these are the least severe sanctions, in light of Defendants' bad faith

conduct, to deter similar conduct and preserve the integrity of the Court. *See Topalian*, 3 F.3d at 937. While the Court is mindful of the "balance between the necessity of avoiding a tainted jury pool" and the right of the DISF and Manookian to investigate potential claims, inform relevant communities, and contact potential witnesses (*see* Dkt. 279 at 11), the Court finds there is adequate bases here to order the removal of the Diamond Doctor customer information from the DISF websites. *See Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488 (5th Cir. 2013).

## IV.  CONCLUSION

Based on the foregoing, Plaintiffs' Emergency Motion for Order to Show Cause (Potential Contempt of Court and Sanctions) (Dkt. 269), is **GRANTED** in part and **DENIED** in part. After careful consideration, the Court concludes the following sanctions are appropriate and are the least severe sanctions adequate to achieve the intended purpose, deter similar conduct, and preserve the integrity of the Court. *See Topalian*, 3 F.3d at 937.

**IT IS THEREFORE ORDERED** that Defendants shall pay Plaintiffs' reasonable attorneys' fees and expenses associated with filing the Emergency Motion, as well as court appearances and the subsequent briefings thereto. Evidence of reasonable attorneys' fees and expenses shall be submitted to the Court no later than August 9. 2017. Defendants may file a response no later than August 11, 2017.

**IT IS FURTHER ORDERED** that Defendants are prohibited from calling as witnesses any former customers of Diamond Doctor, unless Defendants can establish said witnesses were not obtained through the DISF websites, the ring-less voice mails, or other communications initiated by or on behalf of the DISF.[11] However, Defendants are not prohibited from offering a

---

[11]     For example, Defendants assert there are nine customers who have diamond "overgrading" claims pending in court against Diamond Doctor, and who should not be excluded as potential witnesses. The Court agrees, but only

substantial truth defense to Plaintiffs' defamation, libel, and business disparagement claims (as Plaintiffs request), provided they do not call any witnesses prohibited by this Order.

**IT IS FURTHER ORDERED** that from the date of this Order until the conclusion of trial, Defendants shall ensure that no Diamond Doctor customer information is displayed on **any** DISF website. Defendants shall be fined Five Hundred Dollars ($500.00) per day per website for each day Diamond Doctor customer information appears on any DISF website. The Court is confident that Defendant Manookian has sufficient administrative control over the websites to comply with this Order.

**It is SO ORDERED.**

**SIGNED this 3rd day of August, 2017.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

---

to the extent those customers were not identified through the DISF. This should be an easy factual matter to establish given that the DISF was only in existence for a defined period of time.

# United States District Court
### Eastern District of Texas
### Sherman Division

| | | |
|---|---|---|
| DIAMOND CONSORTIUM, INC., DAVID BLANK | § § § | |
| v. | § § | Civil Action No.  4:16-CV-00094 Judge Mazzant |
| BRIAN MANOOKIAN,  CUMMINGS MANOOKIAN, PLC,  BRIAN CUMMINGS | § § § § | |

### ORDER

Pending before the Court is "Defendants' Objections to Magistrate [Judge's] Opinion and Order Regarding Sanctions [Doc. 330]" (Dkt. #345) filed on August 10, 2017, wherein Defendants set forth several objections (collectively, the "Objections") to the Magistrate Judge's Opinion and Order Regarding Sanctions (the "Sanctions Order") (Dkt. #330). Plaintiffs have filed a response. *See* Dkt. #350.

Defendants' Objections relate to "Plaintiffs' Emergency Motion for Order to Show Cause (Potential Contempt of Court and Sanctions)" (the "Emergency Motion") (Dkt. 269), which was referred, pursuant to 28 U.S.C. § 636, to the United States Magistrate Judge for disposition. After a hearing and extensive briefing, the Magistrate Judge concluded that "Defendants' bad faith behavior constitutes an abuse of the judicial process that warrants the imposition of sanctions under the Court's inherent powers." *See* Dkt. #330 at 27. As set forth below, Defendants' Objections are **OVERRULED**.

A party can submit objections to a magistrate judge's order. See Fed. R. Civ. P. 72(a); see also 28 U.S.C. § 636(b)(1)(A). The "clearly erroneous" or "contrary to law" standard of review governs review of such orders. Fed. R. Civ. P. 72(a). If a magistrate judge's decision is "clearly erroneous or is contrary to law," a district court may modify or set aside any portion of the decision.

**Exhibit F**

*Id.* A court's "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

A party must file objections to the order within fourteen days of being served with a copy and may not assign as error a defect to which no objection has been made. Fed. R. Civ. P. 72(a). A party desiring review of a non-dispositive order, entered pursuant to 28 U.S.C. § 636(b)(1)(A), must file a motion for reconsideration within fourteen days after issuance of the magistrate judge's order.

This case is scheduled for jury selection and trial on August 15, 2017. The relevant facts of the dispute underlying the Emergency Motion are detailed in the Sanctions Order and need not be recited here. Defendants assert the following objections to the Magistrate Judge's Sanctions Order:

1. The Sanctions Order refers to "Defendants" and as such appears to erroneously include Defendant Brian Cummings;

2. The Sanctions Order refers to "Defendants" and as such appears to erroneously include Defendant Cummings Manookian PLC;

3. The Sanctions Order exceeds the Court's inherent power by punishing protected First Amendment conduct;

4. The Sanctions Order exceeds the Court's inherent power because it punishes permissible conduct and is based on mere suspicion; and

5. Compliance is Not Possible.

*See* Dkt. #345.

Addressing the first and second objections simultaneously, the Court finds no error in the Magistrate Judge's inclusion of all Defendants in the Sanctions Order. Defendants attack the Magistrate Judge's findings as not being specific enough to identify how they apply to and among Defendants Brian Manookian ("Manookian"), Brian Cummings ("Cummings"), and Cummings

2

Manookian, PLC ("Cummings Manookian"). However, the Magistrate Judge made detailed findings of bad faith conduct as to Defendant Manookian and Defendant Cummings Manookian, the law firm of which Manookian and Cummings are both owners. Under these circumstances, it was not unreasonable for the Magistrate Judge to conclude that Defendant Cummings, an active co-party in this litigation, shared responsibility for the sanctionable conduct. Accordingly, Defendants' first and second objections are overruled.

As to the third objection, the Sanctions Order does not implicate any First Amendment rights. In *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488 (5th Cir. 2013), the Fifth Circuit disapproved the wholesale banning of a website, but the Fifth Circuit also made clear that it "[did] not intend to tie the hands of the district court in addressing some of [a website's] content," as long as consideration of such content is narrowly tailored. *Id.* at 495-96. That is exactly what the Magistrate Judge did here. The Sanctions Order directed the removal of specific, limited content—customer information of Plaintiff The Diamond Consortium, Inc. d/b/a The Diamond Doctor (the "Diamond Doctor")—from the Diamond Integrity Standards Foundation's (the "DISF") website. Furthermore, the restriction was limited in duration from the date of the Order until the conclusion of trial. *See* Dkt. #330 at 29. The Court agrees with the Magistrate Judge that removal of this information is necessary to prevent any improper influence and/or prejudice of witnesses or the jury pool and to protect the integrity of the trial.

The Sanctions Order detailed the bad faith behavior the Magistrate Judge found constituted an abuse of the judicial process, which included Defendant Manookian's submission of an "untrustworthy" document[1] in response to the Magistrate Judge's inquiry regarding Manookian's

---

[1]      In response to the Court's order to submit for *in camera* review documents establishing Manookian's representation of the DISF, Manookian submitted an "attorney-client agreement," allegedly signed by "DeMase" on June 7, 2017. As the Magistrate Judge noted, the date of the "attorney-client agreement" appears suspicious given that it is dated one day prior to the State of Tennessee's approval of the DISF's incorporation on June 8, 2017, when

3

representation of the DISF; Manookian's sudden withdrawal as attorney for the DISF and its mysterious "director" and only known representative, Felipe DeMase; and the termination of the DISF as a business entity on the very day Defendants were to make arrangements for a DISF representative to be deposed by Plaintiffs. Because the bad faith conduct was directly aimed at preventing the Court from finding out how the DISF obtained Diamond Doctor customer information, the Court finds the sanction was narrowly tailored to the offending conduct and Defendants' third objection is, therefore, overruled.

For similar reasons, the fourth objection is also overruled. Defendants argue that the Sanctions Order punishes them based on "mere suspicion." *See* Dkt. #345 at 4. However, as explained above, the Court finds more than "mere suspicion" justified the Magistrate Judge's findings. The Sanctions Order identified and explained the offending conduct in substantial detail. Defendants aver that because Defendant Manookian answered questions at the hearing (refusing to answer only on the basis of privilege) and accepted service of a subpoena to the DISF (to which he promptly filed a motion to quash), there was no pattern of obfuscation. As the Magistrate Judge accurately observed, "[t]hroughout these proceedings, Manookian has feigned adherence to ethical rules, while seemingly using those same ethical rules as a pretense to thwart the Court's efforts to make a thorough and informed inquiry." Dkt. #330 at 23. Furthermore, as the Magistrate Judge clearly explained, it was Defendant Manookian's actions after the hearing (including his submission of a document that appeared to be false—and for which no explanation has yet been offered by Defendants) that the Magistrate Judge found to be deliberately calculated to conceal information from the Court." *See* Dkt. #330 at 20-21. Manookian's submission of a false document

---

Manookian actually filed the DISF's incorporation application on May 4, 2017 (*see* Dkt. 298-10 at 3). Furthermore, Plaintiffs first became aware of the DISF websites on or about May 10, 2017, and the ring-less voice mail calls occurred on or about May 22, 2017, more than a month prior to the date DeMase purportedly signed the agreement.

is evidence that a "fraud has been practiced upon [the Court]." *See Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995). With those findings, and given Defendant Manookian's role as an officer of the Court, the Magistrate Judge had sufficient bases to find that Manookian and Cummings Manookian engaged in bad faith conduct that resulted in prejudice to the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-51 (1991).

The Court also finds the Magistrate Judge exercised the Court's inherent powers "with restraint and discretion." *Chambers*, 501 U.S. at 44, by fashioning a limited sanction that appropriately bars Defendants from calling any witnesses at trial who were former Diamond Doctor customers, unless Defendants are able to establish those customer names were not obtained through the DISF websites, ring-less voice mails, or other communications by DISF. As such, this sanction is appropriately and narrowly tailored to address Manookian's obfuscation, disingenuous testimony, production of untrustworthy documents to the court, and abuse of the judicial process. Accordingly, Defendants' fourth objection is overruled.

Finally, Defendants' fifth objection is also overruled. Defendants claims that compliance with the Court's Order to remove Diamond Doctor customer information from the DISF websites is not possible. *See* Dkt. #345 at 5. However, the Court is persuaded that the Magistrate Judge's conclusion regarding Defendants' ability and/or authority to control the websites is accurate, as demonstrated by the fact that the customer information on the DISF websites has been modified such that customer initials appear to have been substituted for customer names subsequent to the Sanctions Order.

After considering the relevant pleadings, the court finds that Defendants failed to demonstrate how the Magistrate Judge's decision was clearly erroneous or contrary to law.

Based on the foregoing, the Court agrees with the sanctions imposed by the Magistrate Judge, and Defendants' Objections (Dkt. #345) are **OVERRULED**.

**It is SO ORDERED.**

**SIGNED this 15th day of August, 2017.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

**CUMMINGS** MANOOKIAN

Correspondence from:
**Brian Manookian, Esq.**
bmanookian@cummingsmanookian.com

BRIAN CUMMINGS
Licensed to practice in
TN, GA, FL, CA and HI

May 27, 2016

<u>VIA ELECTRONIC MAIL</u>
Chris Schwegmann
cschwegmann@lynnllp.com

BRIAN MANOOKIAN
Licensed to practice in TN

     *Re:    Diamond Doctor, et al. v. Manookian, et al.*

Chris,

     Please communicate the following settlement offer to Mr. Godwin by forwarding this letter. This offer expires at 6:00 P.M. CST this evening. After that time, I will be turning my attention to finalizing our firm's advertising efforts regarding Diamond Doctor at the JCK show this coming week, as well as the filing of the first wave of DTPA claims and the associated Dallas-Metro media blitz.

     With respect to ongoing discussions, after the close of business today, I will not make or accept another settlement offer until all discovery has been completed in:

- Diamond Doctor, et al. v. Manookian, et al. (Federal – TX);
- Cummings Manookian v. Diamond Doctor, et al. (State – HI);
- Cummings Manookian v. Diamond Doctor, et al. (State – TN);
- Brian Manookian v. Diamond Doctor, et al. (State – TN);
- Brian Cummings v. Diamond Doctor, et al. (State – TN);
- Brian Cummings v. Diamond Doctor, et al. (Federal – HI);
- Edward Manookian v. Diamond Doctor, et al. (Federal – TN);
- Kelly Dane v. Diamond Doctor, et al (State – TX);
- Chris Parker v. Diamond Doctor, et al (State – TX);
- Jared Miller v. Diamond Doctor, et al (State – TX);
- Aly Hajee v. Diamond Doctor, et al (State – TX);
- Salman Ali v. Diamond Doctor, et al (State – TX);
- Jacob Lazo v. Diamond Doctor, et al (State – TX);
- Garyn Goldston v. Diamond Doctor, et al (State – TX).

45 Music Square West
Nashville, TN 37203
T  615.266.3333
F  615.266.0250

Pauahi Tower
1003 Bishop St.
Suite 2710
Honolulu, HI 96813
T  808.444.4800
F  808.444.4888

www.cmtriallawyers.com

     The settlement demands following the completion of discovery in the above cases will be identical to the ones below, provided the cash payment portions will double.

**Exhibit G**

I.  **SETTLEMENT OF CLAIMS BY AND AMONG THE DIAMOND DOCTOR PARTIES[1] AND THE CUMMINGS MANOOKIAN PARTIES[2]**

    A.  <u>Actions by the Diamond Doctor Parties</u>

        1.  Monetary Payment to the Cummings Manookian Parties.

            a.  $2,750,000 over five years. $100,000 on June 1, 2016. $100,000 on July 1, 2016. The remainder to be paid in equal monthly installments.

                OR

            b.  $3,000,000 over ten year. $100,000 on June 1, 2016. $100,000 on July 1, 2016. The remainder to be paid in equal monthly installments.

            c.  The entirety of the payments are unconditionally guaranteed by an acceptable FDIC-insured commercial bank.

        2.  Broad Non-Disparagement of the Cummings Manookian Parties.

        3.  Retraction of Allegations against the Cummings Manookian Parties in a Sworn Affidavit with Language to be Agreed Upon.

        4.  Dismissal of Any Pending Suit Following the Filing of an Amended Complaint that Affirmatively Withdraws Allegations against the Cummings Manookian Parties.

        5.  Execution of a Mutual Release by and among the Diamond Doctor Parties and the Cummings Manookian Parties.

    B.  <u>Actions by the Cummings Manookian Parties</u>

        1.  The Cummings Manookian Parties Will Enter Into a Broad Non-Disparagement Provision.

            a.  The provision can contractually preclude future media campaigns or internet activity regarding the Diamond Doctor Parties.

---

[1] The Diamond Doctor Parties are David Blank, Diamond Consortium, and Diamond Doctor.

[2] The Cummings Manookian Parties are Cummings Manookian PLC, Brian Manookian, and Brian Cummings.

2

b.      The provision can contractually preclude participating in any role in future claims by others against the Diamond Doctor parties.

c.      The provision can require removing / deleting / transferring any prior internet activity regarding the Diamond Doctor.

2.      The Cummings Manookian Parties will agree to respond to media, consumer, or potential client inquiries regarding the Diamond Doctor by stating that "All concerns and questions regarding the Diamond Doctor and its sales practices have been resolved, and we and our clients are satisfied with Diamond Doctor's actions," or some other similar language to be agreed upon.

3.      The Cummings Manookian Parties will execute a Mutual Release waiving any and all claims against the Diamond Doctor Parties.

a.      The release will not extend to agents or individuals acting on behalf of the Diamond Doctor Parties.

4.      The Cummings Manookian parties will not agree to a broad confidentiality provision.

a.      The broad dissemination of the allegations against the Cummings Manookian Parties precludes us from agreeing not to disclose the resolution.

b.      The Cummings Manookian Parties are open to reasonable, precisely identified restrictions on the disclosure of the terms of the settlement.

## II.    SETTLEMENT OF CLAIMS BY AND AMONG THE DIAMOND DOCTOR PARTIES AND THE CONSUMER PARTIES[3]

A.    Actions by the Diamond Doctor Parties

1.      Payment of $200,000.00 by July 1, 2016.

2.      Execution of a Mutual Release.

---

[3] The Consumer Parties are Kelly Dane, Chris Parker, Jared Miller, Aly Hajee, Salman Ali, Jacob Lazo, Garyn Goldston.

3

B.  Actions by the Consumer Parties

    1.  Execution of a Mutual Release.  The release may contain standard non-disparagement and confidentiality provisions.

## II. SETTLEMENT OF CLAIMS BY AND AMONG THE DIAMOND DOCTOR PARTIES AND EDWARD MANOOKIAN

A.  Actions by the Diamond Doctor Parties

    1.  Payment of $50,000.00 by July 1, 2016.

    2.  Execution of a Mutual Release.

B.  Actions by Edward Manookian

    1.  Execution of a Mutual Release.  The release may contain standard non-disparagement and confidentiality provisions.

Thank you for communicating this offer to Mr. Godwin.  If we have an agreement in principle by the close of business, I will begin taking the steps outlined in Section I(B) tomorrow morning.  I would then leave it to the very capable attorneys handling this matter to draft the appropriate documents effectuating our agreement.  If not, I appreciate everyone's efforts in attempting to reach a resolution, and I wish you all a great Memorial Day weekend.

Sincerely,

Brian Manookian

4